UNITED STATES of America, Plaintiff,

v.

Martin Henry ROSS, Defendant.

Civ. A. No. 81–72669.

United States District Court,
E.D. Michigan, S.D.

Jan. 6, 1983.

---

Ellen Ritteman, Asst. U.S. Atty., Detroit, Mich., for plaintiff.

James Stewart, Wallace H. Glendening, Detroit, Mich., for defendant.

## MEMORANDUM OPINION

JOHN FEIKENS, Chief District Judge.

This is an action brought pursuant to 28 U.S.C. § 1345 to recover monies due the government from the defendant under an individual loan guarantee executed by him with the Small Business Administration (SBA). For the reasons stated below, I conclude that the United States is entitled to judgment.[1]

## I. FINDINGS OF FACT

1. On April 1, 1976, the SBA loaned Popps Incorporated (Popps), a Michigan meat processing corporation, $450,000.00 at a rate of 6.58% annual interest. This loan was secured with both real and personal property, consisting of meat processing plants and equipment.

2. Martin Henry Ross (Ross) and Donald J. Vlcek (Vlcek) executed contemporaneous unconditional loan guarantees in their individual capacities for Popps' promissory note. Vlcek's guarantee was limited to 16.5% of the outstanding balance of the note; Ross guaranteed the full amount.

3. In late October or early November, 1976, Ross advised SBA that Popps would be unable to meet loan payments. Shortly thereafter, Popps' attorney, Lawrence Snider (Snider), asked SBA to take possession of the loan collateral in its entirety in exchange for a discharge of the personal loan guarantees executed by Ross and Vlcek. Marion Ciesielski (Ciesielski), the SBA loan officer working on Popps' account, refused to accede to Snider's terms and thus did not take immediate possession of the collateral.

4. Throughout November and December of 1976, Ciesielski frequently met with or spoke to Ross or Snider about disposal of the collateral. Although Ross and Snider continued to urge that SBA take over all the property in exchange for a release, Ross also indicated to Ciesielski that he was attempting to sell the company's assets in bulk.[2]

5. Ross was unable to find a buyer for all of the collateral. In a letter dated February 23, 1977, Snider's law firm advised Ciesielski:

[O]ur client has made every reasonable effort, under the circumstances, to attempt to find a purchaser for the equipment and real estate owned by it subject to SBA's security interest and mortgage. It appears, at the present time, that our client has been unable to find or locate a purchaser to acquire all of the corporation's assets in bulk. We have, however, had some inquiries as to a portion of the real estate and/or equipment. These inquiries, as received, have to the best of our knowledge been forwarded to you. There has been one inquiry with respect to a portion of the real estate and I am enclosing a copy of the same for your attention.

Continued possession of the property by our client has subjected Mr. Ross to considerable expense and time.[3]

---

**1.** Because of a pretrial settlement between the government and defendant Donald J. Vlcek, this judgment pertains only to his co-defendant, Martin Henry Ross.

**2.** By this point in time, it was no longer possible to sell Popps as a going concern, because business operations had shut down.

**3.** At trial, Ross maintained he could not make efforts to find a buyer for the collateral, because Ciesielski had advised him against doing so, and because he had insufficient funds to advertise the sale. I do not credit this testimo-

6. On February 28, 1977, SBA accelerated the maturity of the note and made demand for payment upon Popps and Ross. A demand upon Vlcek followed a week later.

7. Ross began to urge SBA to take possession of the personal property collateral even without discharge of the personal guarantee in return, so that SBA could sell the collateral before its value was diminished by vandalism.[4]

8. On February 27, 1977, following various appraisals,[5] SBA prepared an estimate of the collateral's value. Machinery and equipment were valued at $260,172.00, less $63,398.00 in liens; furniture and fixtures were valued at $26,678.00; and the real property was valued at $463,499.00.

9. In April of 1977, SBA took possession of the personal property, after receipt of keys to certain Popps' plants, and made arrangements with Norman Levy Associates, Inc. (an auctioneering firm experienced in liquidation sales but with no particular experience in selling meat processing equipment) to conduct a public auction of the personalty. Ross was notified of this decision.

10. After the personalty was collected in one place and the sale had been advertised four times in the Detroit Free Press and once in the Chicago Tribune, the auction was held on July 21, 1977. Over fifty persons attended. (Plaintiff's Exhibit 12, Buyers' List). Many of those attending were engaged in the meat processing trade. The collateral was first offered in bulk, and then piecemeal. The sale grossed $117,864.05, with a net of $69,976.99 to SBA.

11. SBA has never taken possession of Popps' realty. Four parcels have been sold, for a net profit of approximately $43,000.00.

12. As of January 5, 1981, the unpaid balance of the loan was $486,659.09, consisting of $408,268.77 in principal, and $78,390.32 in interest. Interest has been accruing since then at the daily rate of $75.13.

## II. CONCLUSIONS OF LAW

In the guarantees which Ross and Vlcek signed, the following language appears:

> In case the Debtor shall fail to pay all or any part of the Liabilities when due, . . . according to the terms of said note, the Undersigned, immediately upon written demand of Lender, will pay to Lender the amount due and unpaid by the Debtor as aforesaid, in like manner as if such amount constituted the direct and primary obligation of the Undersigned. Lender shall not be required, prior to any such demand on, or payment by, the Undersigned, to make demand upon or pursue or exhaust any of its rights or remedies against the Debtor or others with respect to the payment of any of the Liabilities, *or to pursue or exhaust any of its rights or remedies with respect to any part of the collateral.* The Undersigned shall have no right of subrogation whatsoever with respect to the Liabilities of the collateral unless and until Lender shall have received full payment of all the Liabilities. (emphasis added).

■ It is undisputed by the parties that SBA never took possession of Popps' realty. Ross now raises this failure to take possession of the realty and prevent deterioration in its value as a defense to his obligation as guarantor of the note. In light of the guarantee's language quoted above, this defense is simply not tenable. SBA cannot be obligated to take possession of the collateral; without possession, it has no duty to preserve the property.[6] *United States v.*

---

ny. Instead, I find that the reason Ross did not sell the collateral was because he was unable to find willing buyers, as the above letter indicates. Although there may have been parties interested in some of the property, no evidence of firm offers for any of the equipment prior to the auction sale was presented in this case.

4. Vandalism had already begun to occur.

5. A December 10, 1976 appraisal of the collateral's forced liquidation value by Norman Levy Associates, Inc. resulted in an estimate of $143,051.00.

6. Language in the guarantee (quoted *infra*) making SBA liable for loss to the property caused by its own willful acts or omissions should not be read to apply to diminishment in value caused by failure to take possession.

*Champion Sprayer Company,* 500 F.Supp. 708 (E.D.Mich.1980). Thus, I grant judgment against defendant with respect to this defense.

The disposition of Popps' personalty is another matter. Because SBA did take possession of the personal property collateral, it was obligated to deal with it in a commercially reasonable manner. *United States v. Willis,* 593 F.2d 247 (6th Cir.1979); *United States v. Champion Sprayer Company, supra.* This obligation is derived from both the general duties of secured parties, and from the terms of the guarantee itself. The guarantee reads in part:

The obligations of the Undersigned hereunder, and the rights of the Lender in the collateral, shall not be released, discharged or in any way affected, nor shall the Undersigned have any rights against Lender: by reason of the fact that any of the collateral may be in default at the time of acceptance thereof by Lender or later; nor by reason of the fact that a valid lien in any of the collateral may not be conveyed to, or created in favor of, Lender; nor by reason of the fact that any of the Liabilities may be invalid for any reason whatsoever; nor by reason of the fact that the value of any obligator under or guarantor of any of the collateral, may not have been correctly estimated or may have changed or may hereafter change; nor by reason of any deterioration, waste, or loss by fire, theft or otherwise of any of the collateral, *unless such deterioration, waste, or loss be caused by the willful act or willful failure to act of Lender.* (emphasis added).

It is defendant's contention that SBA acted in a commercially unreasonable manner and that it was willfully negligent in its handling of the sale of Popps' personalty. More specifically, defendant argues that the auction sale was inappropriate and that a private placement sale instead should have been held. I do not agree.

█ In evaluating the sale conducted by SBA, I must apply the standard set forth by

the United States Court of Appeals for the Sixth Circuit in *United States v. Willis, supra.* The Court held that a secured party's sale of collateral:

. . . is commercially reasonable if the party (1) acts in good faith, (2) avoids loss, and (3) makes an effective realization. Furthermore, the party may obtain court approval if he (4) sells in the usual manner in a recognized market, or (5) sells at the current price in a recognized market, or (6) sells in conformity with reasonable commercial practices among dealers in the type of property. *Id.* at 259.

█ I find that the sale conducted by SBA meets this standard. I conclude that it was commercially reasonable, because SBA acted in good faith, avoided loss, and made an effective realization, as well as selling the assets in the usual manner in a recognized market.

In so concluding, I am mindful that the burden of proving the commercial reasonableness of the sale is upon SBA. *United States v. Willis, supra.* This burden has been met.

If Ciesielski had received firm offers for Popps' equipment and had nevertheless allowed the equipment to be sold at auction for considerably less, this case would be on all fours with *Willis,* and I would conclude that SBA had acted unreasonably. This is far from what occurred, however. After Ross advised Ciesielski that Popps would be unable to meet its debt, Ciesielski gave Ross time to find buyers for the business assets. By Popps' lawyer's own admission, these efforts were unavailing. I see here no deliberate turning away from a profitable offer as was evident in the *Willis* situation. Rather, the facts at hand are much more similar to those involved in *United States v. Champion Sprayer Company, supra.*

In *Champion Sprayer,* Judge Gilmore of this District held that an auction sale similar to the one conducted in this case was not commercially unreasonable. Among the facts Judge Gilmore relied upon to conclude

*Duke v. Reconstruction Furnace Corp.,* 209 F.2d 204 (4th Cir.1954); *United States v. Ab-*

*bruzzese,* 553 F.Supp. 11 (E.D.Mich.1982) (Boyle, J.).

that the sale was not unreasonable were the following: the sale was extensively advertised;[7] sixty-six bidders attended; and the price realized was more than double the only bid for the property in bulk. Rejecting defendant's contention that the sale was commercially unreasonable because a private negotiated sale or a public sale among those in the sprayer business might have yielded more money,[8] the court said:

Defendants' general averments that the price was not the current price in the recognized market ... do not effectively detract from plaintiff's well documented proof that the sale was "commercially reasonable." As the Court noted in *United States v. Bass,* 618 F.2d 500, 504 (8th Cir.1980), when rejecting a claim of commercial unreasonableness in an SBA auction, "Guarantors or owners cannot expect that the highest market value or anything close to it will be received on auctioned property in foreclosure sales of this type." *Id.* at 710.

Judge Gilmore then went on to hold that the auction sale in *Champion Sprayer* conformed to the standard of a sale conducted in the usual manner in a recognized market.

■ I must similarly regard the sale which took place here. Ross attempted to show at trial that the market value of the goods sold at auction was much greater than the amount received.[9] Besides the fact that I give little weight to the post hoc type of valuation presented by defendant, I must also stress that a disparity between the price received at a forced liquidation and abstract market value is neither unexpected, as the United States Court of Appeals for the Eighth Circuit observed in *United States v. Bass, supra,* nor dispositive on the issue of commercial reasonableness. *United States v. Champion Sprayer Company, supra.* There is no evidence before me

that Ross attempted to stop the auction sale, or made any written objections to it. There is also no evidence before me that there was something irregular about the procedures followed prior to or at the sale. Ross' bare assertion that another type of sale would have resulted in a greater gross return does not undermine SBA's showing that the sale was conducted in a commercially reasonable manner.

For the reasons stated above, judgment is entered in favor of the United States of America.

## ORDER GRANTING PLAINTIFF SUMMARY JUDGMENT AS TO THE FIRST DEFENSE RAISED BY DEFENDANT ROSS AND AWARDING JUDGMENT TO PLAINTIFF

This action by the United States of America to enforce a loan guaranty made by defendant Martin Henry Ross to the Small Business Administration, and it appearing that defendant Ross has raised two defenses to this action:

1. that the Small Business Administration impaired real estate securing the original loan and by failing to take possession of the real estate and by failing to foreclose or to sell such real estate; and

2. that the Small Business Administration foreclosed on the personalty securing the original loan in a commercially unreasonable manner,

and it further appearing that the facts are not in dispute as to the first defense, and the court having considered the facts, and the arguments of counsel and being fully advised.

IT IS HEREBY ORDERED for the reasons stated in open court on November 9, 1982, that summary judgment as to this defense be entered for plaintiff.

---

**7.** Circulars were mailed to potential buyers and an advertisement ran in the Detroit Free Press twice.

**8.** The defendant averred that the market price of the collateral was at least $43,835.00 more than the approximately $24,000.00 obtained at auction.

**9.** In his testimony, Mihran Hoplamazian, a witness engaged in the butcher supply business, estimated that the value of the equipment sold at auction was approximately $600,000. This estimate was not made at the time of sale, however; it was reconstructed from an examination of the list of equipment sold at auction.

IT IS FURTHER ORDERED for the reasons stated on the record in open court on November 10, 1982, and for the reasons set forth in the Supplemental Memorandum Opinion entered herewith, that judgment be entered as to the second defense in favor of the United States of America.

## JUDGMENT

This cause having come on for trial before the court and the issues having been considered and a decision rendered,

IT IS HEREBY ORDERED THAT JUDGMENT BE ENTERED AGAINST MARTIN HENRY ROSS for the AMOUNT OF $537,329.83 (principal and interest), and interest at the rate provided by law as of the date of judgment, 28 U.S.C. § 1961 as amended by P.L. 97–164 § 302, effective October 1, 1982.